**MILBERG PHILLIPS GROSSMAN LLP**
David Azar (CA Bar No. 218319)
16755 Von Karman Avenue, Suite 200
Irvine, California 92606
Telephone:  212-594-5300
Email:      dazar@milberg.com

**MILBERG PHILLIPS GROSSMAN LLP**
Peggy Wedgworth (*pro hac vice forthcoming*) (NY Bar No. 2126159)
Andrei Rado (*pro hac vice forthcoming*) (NY Bar No. 3047289)
Blake Yagman (*pro hac vice forthcoming*) (NY Bar No. 5644166)
One Pennsylvania Plaza, Suite 1920
New York, New York 10119
Telephone:  212-594-5300
Email:      pwedgworth@milberg.com
            arado@milberg.com
            byagman@milberg.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASANTE CLEVELAND, on behalf of himself, and all others who are similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SK ENERGY AMERICAS, INC.; SK TRADING INTERNATIONAL CO. LTD., VITOL INC., and JOHN DOE CORPORATIONS 1-75,<br><br>Defendants. | CASE NO. ___**'20 CV0893 WQH LL**___<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>1. VIOLATIONS OF THE SHERMAN ANTITRUST ACT – COUNT 1: 15 U.S.C. §1, *et seq.*;<br><br>2. VIOLATIONS OF THE CARTWRIGHT ACT – COUNT 2:  Cal. Bus. & Prof. Code § 16720 *et seq.*; and,<br><br>3. VIOLATIONS OF THE UNFAIR COMPETITION LAW – COUNT 3: Cal. Bus. & Prof. Code § 17200 *et seq.* |

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION .................................................................................................1

JURISDICTION AND VENUE .........................................................................2

PARTIES.............................................................................................................3

   A.  Plaintiff .....................................................................................................3

   B.  Defendants ................................................................................................3

   C.  Agents and Co-Conspirators ....................................................................4

CLASS ACTION ALLEGATIONS ...................................................................5

FACTUAL ALLEGATIONS ..............................................................................7

   A.  California's Gasoline Industry...................................................................7

   B.  Gasoline Spot Market in California ..........................................................8

   C.  Trading of Regular CARBOB and Premium CARBOB Gasoline in
       California ...............................................................................................10

   D.  Federal and State Law Prohibit Fraudulent and Deceptive Commodity
       Trading..................................................................................................11

   E.  Defendants Illegal Conduct ....................................................................12

      i.    Prior to the Explosion in Torrance ...............................................12

      ii.   The Explosion in Torrance and the Immediate Aftermath ...........13

      iii.  The Defendants' Conduct After the Explosion in Torrance .........14

      iv.  The Defendants Actively Worked to Conceal Their Illegal Conduct........15

TOLLING OF THE STATUES OF LIMITATION ..........................................17

CLAIMS FOR RELIEF ....................................................................................18

COUNT ONE  VIOLATION OF THE SHERMAN ANTITRUST ACT .....18

COUNT TWO  VIOLATION OF THE CARTWRIGHT ACT ...................19

COUNT THREE  VIOLATION OF THE UNFAIR COMPETITION
LAW ........................................................................................................20

PRAYER FOR RELIEF .........................................................................21

Plaintiff Asante Cleveland ("Plaintiff") on behalf of himself and all others who are similarly situated, brings this class action for treble damages, equitable relief, and all other relief that this Court deems just and proper against Defendants SK Energy Americas, Inc. ("SK Energy"), SK Trading International Co. Ltd. ("SK Trading") (collectively, "SK"), Vitol, Inc. ("Vitol"), and John Doe Corporations 1-75 (collectively, the "Defendants") for violations of the Sherman Act, the Cartwright Act, and California's Unfair Competition Law.

## INTRODUCTION

1.     On February 18, 2015, a massive explosion ripped through the ExxonMobil gas refinery in Torrance, California (the "Torrance Refinery").[1] At the time of the explosion, the ExxonMobil gas refinery supplied about 1/5th of the gasoline sold in Southern California and about 1/10th of the gasoline sold across the state of California.[2]

2.     The Defendants – who are major traders in the spot market for gasoline and gasoline blending products in California, along with their employees – carried out an illegal price fixing scheme (the "Scheme") while using the explosion at the gas refinery in Torrance as cover for said Scheme. Prior to the explosion, the Defendants had already begun secretly working together; this occurred by way of the lead spot market traders for both SK and Vitol who had been former colleagues when they worked together at Vitol. These two traders, in addition to other employees, worked on behalf of the Defendants to restrain competition in the

---

[1] *See* CSB "Final Report into 2015 Explosion at Exxon Mobile Refinery in Torrance California," (May 3, 2017) https://www.csb.gov/csb-releases-final-report-into-2015-explosion-at-exxonmobil-refinery-in-torrance-california/.

[2] *See* U.S. Chemical Safety & Hazard Investigation Board "ExxonMobil Torrance Refinery Investigation Report" No. 2015-02-I-CA (May 3, 2017) https://www.csb.gov/file.aspx?DocumentId=6023 at p. 8.

gasoline and gasoline blending product spot market in California from February 18, 2015 through the end of 2016.

3.      The Defendants carried out this Scheme to the detriment of California consumers, like Plaintiff Cleveland, and were able to do so by: (1) deploying sham transactions to obfuscate the actual supply and demand for gasoline in California, (2) trading amongst themselves with the intent of creating spikes in the gasoline spot market, and (3) entering into unreported arrangements amongst themselves to share the profits made as a result of the scheme.

4.      Defendants' illegal conduct came to light on May 4, 2020, when California Attorney General, Xavier Becerra, filed a redacted complaint alleging in detail how Defendants rigged the spot price of gasoline in California, in violation of the Cartwright Act and California's Unfair Competition Law.[3] As alleged herein, in addition to the violations of the foregoing California statutes, Defendants' conduct also violated the Sherman Act.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1337 over the Sherman Act claim because this action arises under a federal statute, the Sherman Act (15 U.S.C. § 1).

6.      This Court has ancillary and pendant jurisdiction over the state law claims alleged herein, which arise under the same conduct as the Sherman Act claims.

7.      This Court also has jurisdiction pursuant to the Class Action Fairness Act, as there is over $5,000,000 in damages to the Plaintiff and the members of the proposed Class, there are well over 100 people affected, and one plaintiff is from a

---

[3] *People of the State of California v. Vitol, Inc., et al.*, Case No. _____ (Sup. Ct., San Francisco Cnty.)(filed May 3, 2020).

different state than one defendant (Plaintiff Cleveland is from a different state than Defendant Vitol).

8.      Venue is proper in this district pursuant to 15 U.S.C. § 15 and 22, and 28 U.S.C. § 1391(b) and (c), because a substantial portion of the events giving rise to Plaintiff's claims occurred in this District and a substantial portion of the affected interstate commerce affected by the Defendants' scheme was deployed in this District. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal restraint of trade throughout this District. The anticompetitive conduct alleged in this Complaint has been directed at, and has the effect of, causing injury to persons residing in, located in, or doing business in this District.

## PARTIES

### A.      Plaintiff

9.      Plaintiff Asante Cleveland is a resident of the State of California. During the Class Period, Plaintiff Cleveland lived and worked in San Diego, California. During the Class Period, Plaintiff Cleveland purchased gasoline frequently from retail locations in this District, including on August 8, 2016, when Plaintiff paid $39.79 for gasoline at an Arco station in San Diego, California.

### B.      Defendants

10.      Defendant SK Energy is a California corporation with its principal place of business in Houston, Texas. During the Class Period, SK Energy functioned as SK Trading's California trading operation.

11.      Defendant SK Trading is a South Korean corporation with its principal place of business in Seoul, South Korea. SK Trading is the parent company of SK Energy International and the indirect parent company of SK Energy.

CLASS ACTION COMPLAINT                                                                                      3

12.     Defendants SK Energy and SK Trading are subsidiaries of SK Innovation Co., Ltd., a South Korean energy company with its principal place of business in Seoul, South Korea. The SK entities were principals, agents, alter egos, joint venturers, partners, or affiliates of each other, and in doing the acts alleged herein, were acting within the course and scope of that principal, agent, alter ego, joint venture, partnership, or affiliate relationship.

13.     Vitol is a Delaware corporation with its principal place of business in Houston, Texas. Vitol operates a trading firm and is a subsidiary of Vitol Holding, B.V., an international energy and commodities company based in the Netherlands.

14.     John Doe Corporations 1-75 are other individuals or entities who engaged in or abetted the unlawful conduct set forth in this Complaint. Plaintiffs intent to seek leave to amend this Complaint upon learning the true identity of these Doe Defendants.

### C.     Agents and Co-Conspirators

15.     Throughout the Class Period, the Defendants were and are the agent of each of the remaining Defendants, and in doing the acts alleged herein, were acting within the course and scope of such agency. Each Defendant ratified, participated in, or authorized the wrongful acts of each of the Defendants. Defendants are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions that are subject of this Complaint. Defendants have participated as members of the conspiracy or acted with or in furtherance of it, aided or assisted in carrying out its purposes alleged in this Complaint, and have performed acts and made statements in furtherance of the violations and conspiracy.

## CLASS ACTION ALLEGATIONS

16.     Plaintiff Cleveland brings this action on behalf of himself and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("F.R.C.P. Rule 23"), seeking damages and equitable relief on behalf of the following Class:

> All persons who purchased refined gasoline at retail in California from February 18, 2015 until December 31, 2016 (the "Class Period").

17.     Excluded from the Class are Defendants, their parent companies, subsidiaries, and affiliates, any co-conspirators, Defendants' attorneys in this case, federal government entities and instrumentalities, states and their subdivisions, all judges assigned to this case, and all jurors assigned to this case.

18.     This action has been brought and may be properly maintained on behalf of the Class under the criteria of F.R.C.P. Rule 23.

19.     **Numerosity – F.R.C.P. Rule 23(a)(1).** The members of the Class are so numerous that individual joinder of all Class members is impracticable. The precise number of Class members is unknown to Plaintiff, but it is likely to be in the millions.

20.     **Commonality and Predominance – F.R.C.P. Rule 23(a)(2) and (b)(3).** This action involves questions of law and fact common to the Class, which predominate over any individual questions, including:

> a.     Whether Defendants contracted, combined or conspired with one another to restrain trade in the spot market for gasoline at any time during the Class Period;

> b.     Whether Defendants' conduct caused the prices of gasoline sold at retail to be higher than the competitive level as a result of their restraint of trade;

c.  Whether Plaintiff and the other members of the Class were injured by Defendants' conduct and, if so, the determination of the appropriate Classwide measure of damages; and,

d.  Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

21.  **Typicality – F.R.C.P. Rule 23(a)(3).** Plaintiff's claims are typical of the other Class members' claims because Plaintiff, like other Class members, paid for gasoline at retail in California during the Class Period.

22.  **Adequacy of Representation – F.R.C.P. Rule 23(a)(4).** Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other Class members whom he seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Class members' interests will be fairly and adequately protected by Plaintiff and his counsel.

23.  **Superiority of Adjudication as a Class Action – F.R.C.P. Rule 23(b)(3).** Because of the aforementioned allegations, and in an effort to preserve judicial economy, this case will be best maintained as a Class Action, which is superior to other methods of individual adjudication of these claims.

24.  **Certification of Specific Issues – F.R.C.P. Rule 23(c)(4).** To the extent that the Class does not meet the requirements of F.R.C.P. Rules 23(b)(2) or (b)(3), Plaintiff seeks certification of issues that will drive this litigation toward resolution.

25.  **Declaratory and Injunctive Relief – F.R.C.P. Rule 23(b)(2).** The Defendants have acted or refused to act on grounds generally applicable to Plaintiff

and other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to Class members as a whole.

26.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a Class Action.

## FACTUAL ALLEGATIONS

### A.    California's Gasoline Industry

27.    The process by which gasoline reaches consumers is different on the west coast of the United States – and specifically, in the State of California – than it is in comparison to the rest of the United States.

28.    First, gasoline becomes accessible to consumers through a supply chain which starts with the extraction of crude oil and its transport to refineries – like the ExxonMobil refinery in Torrance, California. From the refineries, the refined gasoline is then sold in wholesale amounts where it is then shipped by truck to retail



gas stations.

29.     Because California is geographically isolated from the other refining hubs across the United States and because there are no pipelines that ship finished gasoline products into California, gasoline distributors in the state are forced to ship additional refined gasoline and gasoline blending products by marine vessel.

30.     California also has unique vehicle emissions that are more strict than other areas of the United States. Gasoline which is produced pursuant to California's standards is called California Reformulated Gasoline Blendstock for Oxygenate Blending ("CARBOB"). And, because CARBOB standards are unique to California, gasoline from other states cannot be readily used as it does not meet the CARBOB standards.

31.     As the West Coast Petroleum Supply Map shows, one of the biggest CARBOB refineries is located near Southern California – where the ExxonMobil refinery in Torrance, California is located. Of all the CARBOB-regulated gasoline refined in California, the Torrance Refinery produces approximately $1/5^{th}$ of the gasoline sold in Southern California and approximately $1/10^{th}$ of the gasoline sold across the state.

32.     When unexpected disruptions to the supply chain occur – like the explosion at the Torrance Refinery – California is forced to import whatever gasoline it can find that meets CARBOB standards, and this can lead to a delayed capacity to produce CARBOB-regulated gasoline for California's consumers.

**B.     Gasoline Spot Market in California**

33.     The "spot" market refers to the purchase and sale of fuel that physically changes possession at a refinery gate or at some other major pricing hub for delivery (like a pipeline or a barge). Spot market sales of gasoline in wholesale are always

completed in increments of 5,000 barrels (210,000 gallons) to 50,000 (2.1 million gallons) at a time.[4]

34.    California has two major spot markets – one in Los Angeles and the other in San Francisco. The prices on these centralized markets are influenced by the gasoline prices prevailing on the New York Mercantile Exchange ("NYMEX"). All of the transactions tied to NYMEX are publicly reported so that pricing on the billions of gallons traded on a daily basis is transparent to market participants.[5]

35.    However, NYMEX's pricing on wholesale commodities – like gasoline – reflect national and international factors as well as regional and local supply and demand conditions.[6] And, in many of California's spot market sales, the buyer and seller only negotiate the basis while the final price is determined by adding the basis to the price set by the NYMEX.[7] Accordingly, NYMEX spot prices for gasoline plays a limited role in gasoline pricing by local traders.

36.    Wholesale (or "Rack") purchases are made throughout points in the fuel distribution system. These purchases are conducted in 8,000-gallon increments, which is the amount of fuel that an average fuel truck is capable of carrying. Companies that re-sell fuel professionally (or "jobbers") as well as retailers and end users (for example, trucking companies) retrieve their fuel from the wholesale racks.

---

[4] *See* OPIS by IHS Markit, https://www.opisnet.com/product/pricing/spot/ (last visited May 12, 2020).

[5] *See* Scott Berhang, *Pricing 101 Part 2: Spot Fuel Markets Made Simple*, OPIS Blog (May 12, 2020, 4:12 PM), http://blog.opisnet.com/spot-fuel-markets-made-simple.

[6] *See* Scott Berhang, *Pricing 101 Part 1: Your Basic Guide to Pricing Gasoline and Diesel*, OPIS Blog (May 12, 2020, 4:15 PM), http://blog.opisnet.com/pricing-101-your-basic-guide-to-pricing-gasoline-and-diesel.

[7] *See* Berhang, *supra* note 5.

The prices tied to the sale of gasoline from these racks moves up or down based on movements in the daily California spot market.

37.     Additionally, with respect to the gasoline itself, there are two types of CARBOB-regulated gasoline that are traded on the spot markets in California – Regular CARBOB ("Regular") and Premium CARBOB ("Premium"). Premium, by way of comparison, trades at a higher price than regular and is traded with far less frequency. These two types of gasoline are created when Alkylate, a high-quality gasoline blending product, is added with other blend stocks to create gasoline. Alkylates are a key component to achieving high octane ratings required to sell Premium gasoline at retail in California.[8]

### C.     Trading of Regular CARBOB and Premium CARBOB Gasoline in California

38.     Unlike NYMEX, the gasoline spot market in California for both Regular CARBOB and Premium CARBOB gasoline are traded through non-public transactions, called "over-the-counter" ("OTC") trades. And, because OTC trades do not occur with complete transparency that is offered with trading through an exchange like NYMEX, prices on the California spot market are not made immediate public.

39.     And so, traders of gasoline on the California spot market are relegated to relying on price-reporting services which report market prices from sources that

---

[8] *See* U.S. Energy Information Administration,
 https://www.eia.gov/todayinenergy/detail.php?id=9971 (last visited May 12, 2020). Approximately 85% of gasoline sold at retail is "regular" gasoline. Another 10% is "premium" gasoline. The remainder is called "midgrade" gasoline. "[R]efineries do not produce a midgrade gasoline blend; instead, the middle-octane option is blended at the fuel pump from a given gas station's supply of regular and premium gas." See Tom Appel, *What is Midgrade Gas?*, The Daily Drive (May 12, 2020 4:32 PM), https://blog.consumerguide.com/what-is-midgrade-gas/.

participate in the market, such as traders, refiners, and brokers.[9] Indeed, the most widely-used reporting service, at least with respect to the gasoline spot market, is called the Oil Price Information Service, LLC ("OPIS"). OPIS is a subscription-based service that publishes daily reports so that buyers and sellers in California have industry pricing benchmarks on which to base their trading. OPIS depicts the "Fuel Price Influence Chain" as follows:



### The Fuel Price Influence Chain

**NYMEX**
Paper market, influenced by big-scale regional and international factors.

**SPOT MARKET**
Physical market, high volume, located at refinery hubs. Reacts to NYMEX and regional supply news.

**RACK MARKET**
Smaller volume market, often located off a pipeline. Follows spot market direction, changing at 6pm each day.

**RETAIL MARKET**
Street price for gasoline and diesel. Follows rack pricing, though reaction time is usually two/three days later.

### D. Federal and State Law Prohibit Fraudulent and Deceptive Trading in Connection With Commodities

40. Spot market trading of gasoline must comply with California's commodities fraud statute. *See* Cal. Corp. Code § 29504. Under this statute it is unlawful to engage in certain fraudulent acts when buying or selling commodity contracts. *See id.* § 29536, subds. (a), (b), (c), (d).

41. Under Section 29536(c) it is unlawful to "[t]o willfully engage in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon any persons." *See id.* § 29536(c).

---

[9] *See OPIS Wholesale Rack Pricing*, OPIS by IHS Markit (May 12, 2020, 4:37 PM), https://www.opisnet.com/about/methodology/#wholesale-rack-pricing ("OPIS market assessors follow the marketplace throughout a full day of trading by constant communication with designated and approved traders and brokers to discover done deals, bids and offers.").

42.   In addition, the Federal Commodity Exchange Act ("CEA") makes unlawful certain types of "[p]rohibited transactions." *See* 7 U.S.C. § 6c. More specifically, the CEA prohibits any transaction that "is, of the character of, or commonly known to the trade as, a 'wash sale' or 'accommodation trade.'" *See* 7 U.S.C. § 6c(a)(2)(A)(i).

43.   The CEA also prohibits a transaction that "is used to cause any price to be replied, registered, or recorded that is not a true and bona fide price." *See* 7 U.S.C. § 6c(a)(2)(B).

E.   **Defendants Illegal Conduct**

   i.   **Prior to the Explosion in Torrance**

44.   During the Class Period, Vitol was a major participant in the gasoline spot market trade – as it both bought and sold spot market contracts in California for various types of fuel products, including CARBOB Regular and CARBOB Premium.

45.   Additionally, throughout the Class Period, Vitol imported gasoline and gasoline blending products into the State of California.

46.   Vitol employee Brad Lucas ("Lucas") was the primary trader at Vitol tasked with trading gasoline and gasoline blending products that were delivered via pipeline within California.

47.   While at Vitol, Lucas reported directly to John Addison ("Addison"), a Vitol executive who reported to the President of Vitol Americas. Addison, in addition to supervising Lucas, also had the responsibility of trading gasoline and gasoline blending products that were delivered via marine vessels to the State of California.

48.   During the Class Period, SK was a major participant in the gasoline spot market trade – as they both bought and sold spot market contracts in California

for various types of fuel products, including CARBOB Regular and CARBOB Premium.

49.     Additionally, throughout the Class Period, SK imported gasoline and gasoline blending products into the State of California.

50.     SK Energy employee David Niemann ("Niemann") was the primary trader at SK responsible for executing trades in California with respect to California's spot market for gasoline. A subordinate of Niemann's, Shelly Mohammed ("Mohammed"), was the gasoline scheduler.

51.     SK Energy functioned as SK Trading's California trading arm at all relevant times during the Class Period. And while Niemann and Mohammed were considered to be employees of SK Energy, SK's U.S. West Coast trading operations were conducted within the control and supervision of SK Trading and its subsidiaries. SK Trading also reviewed and approved key decisions to coordinate its trading activity with Vitol.

### ii.     The Explosion in Torrance and the Immediate Aftermath

52.     During the morning of February 18, 2015, there was a massive explosion at the Torrance Refinery.

53.     The blast took place within the FCC unit, which is the "fluid catalytic cracking" unit, which holds a crucial role on the refining of CARBOB gasoline; specifically, the FCC unit produces high-quality blending products like alkylate. And, up and until the explosion on February 18, 2015, the FCC unit at the Torrance Refinery produced a large portion of all of the high-octane alkylate produced in California.

54.     As a result of the explosion, the Torrance Refinery closed the FCC unit and reduced production of gasoline products, like alkylate, until repairs could be completed. Due to this unforeseen circumstance, ExxonMobil needed to replace the

1  lost alkylate production in California if it wanted to continue producing and refining

2  CARBOB-regulated products.

3         **iii.**    **The Defendants' Conduct After the Explosion in Torrance**

4        55.    Beginning at least as early as late February 2015, and while using the

5  explosion at the Torrance Refinery as cover for their illegal efforts, Vitol and SK

6  Energy – through Lucas, Niemann, Mohammed, and others – reached agreements

7  amongst themselves to raise, fix, and otherwise tamper with the price of refined

8  gasoline in California. The Defendants were able to carry out the scheme by

9  manipulating OPIS-reported prices in order to actualize supra-competitive profits

10  while limiting market risk. As alleged above, OPIS-reported pricing is used by

11  buyers and sellers in California to benchmark the spot price of gasoline.

12        56.    Primarily, the Defendants specifically engaged in trades (either directly

13  or indirectly) between them that were reported to OPIS with the intent of inflating

14  the OPIS-published price for Regular CARBOB and Premium CARBOB gasoline.

15  Occasionally, the Defendants used an intermediary broker, and, at other times, the

16  Defendants transacted directly with each other. The goal of this conduct was to

17  create the illusion of a supply and demand imbalance for refined gasoline and to

18  drive up spot market prices to artificial highs during strategic pricing windows.[10]

19        57.    Additionally, the Defendants executed intentionally market-spiking

20  trades for Premium CARBOB gasoline to increase the strategic prices for alkylates.

21

22  [10] These transactions were often "leveraged" transactions because they involved

23  intentionally taking losses on the purchase side of smaller quantities of gasoline in
order to artificially increase the profits on the sale of larger quantities of gasoline.

24  By way of an example, the Defendants traded Regular CARBOB gasoline contracts

25  with inflated prices earlier in the trading day in order to manipulate the OPIS price
that was reported to other market competitors in the gasoline spot market – this

26  would signal a supply and demand imbalance to the market, artificially inflating spot

27  market prices.

28

The price of alkylates is generally tied to the OPIS-reported spot price for Premium gasoline.

58.    The Defendants' manipulation of spot prices for Regular CARBOB gasoline also influenced the price of alkylate because spot prices for Regular CARBOB gasoline and Premium CARBOB gasoline move in tandem with each other.

59.    Thus, in order to actualize their supra-competitive profits with respect to alkylate, the Defendants worked together to inflate the price of Regular CARBOB and Premium CARBOB during key pricing windows, and then proceeded to coordinate their importation of alkylate during the Class Period into California at supra-competitive prices.

### iv.    The Defendants Actively Concealed Their Illegal Conduct

60.    The Defendants executed secondary "wash" trades with the intent to hide or disguise their conduct, to limit or eliminate market risk on reported trades, and to share their anticompetitive profits amongst each other.[11]

61.    By hedging each of their reported trades, the secondary transaction ensured that there was little to no market risk associated with the conduct of the Defendants.

62.    Defendants also had names for their illegal agreements, which they called "joint ventures" or "JVs," which, in reality, were nothing more than a

---

[11] "A wash trade is a form of *fictitious trade* in which a transaction or a series of transactions give the appearance that authentic purchases and sales have been made, but where the trades have been entered without the intent to take a *bona fide market position* or without the intent to execute bona fide transactions subject to *market risk* or *price competition*," *Wash Trades – Definition of a Wash Trade*, CME Group (May 12, 2020, 4:45 PM), https://www.cmegroup.com/education/courses/market-regulation/wash-trades/definition-of-a-wash-trade.html (emphasis in original).

conspiracy between purported competitors to artificially increase spot market prices for Regular CARBOB and Premium CARBOB gasoline in California.

63.    During the Class Period, the Defendants' illegal conduct generated millions of dollars in profits for the members of the conspiracy each month. Lucas and Niemann financially benefitted directly from the conduct alleged herein. The chart (below) depicts the effect of the Defendants' illegal conduct on gasoline prices before and during the Class Period.[12]



64.    Additionally, the production of CARBOB gasoline in California did not change, despite the explosion at the Torrance facility. There was no supply shock to account for in order to explain the surge in pricing on the spot market and for consumers during the Class Period.[13]

---

[12] *See* Severin Borenstein, *California's Mystery Gasoline Surcharge Continues*, Energy Institute at HAAS (May 12, 2020, 4:47 PM), https://energyathaas.wordpress.com/2018/02/26/californias-mystery-gasoline-surcharge-continues/.

[13]    *Data    on    California    Gasoline    Price    Margins*, https://www.energy.ca.gov/sites/default/files/2019-05/Data_on_California_Gasoline_Price_Margins.pdf.

65.     Defendants' persistent manipulation of the spot market price caused retail gasoline prices to be higher throughout the Class Period. Defendants' profits were made at the behest of California consumers.

66.     The impact of Defendants' Scheme was substantial, costing retail gasoline purchasers an estimated $2.4 billion.[14]

## **TOLLING OF THE STATUES OF LIMITATION**

67.     Class member purchases of gasoline within four years prior to the filing of this Complaint are not barred by the applicable four-year statute of limitations and are not required to be tolled in order to be actionable.

68.     Plaintiff and the Class did not know of Defendants' illegal conduct until the California Attorney General filed its complaint against Defendants on May 4, 2020. Further, Plaintiff and the Class had no reason to believe that they paid prices for gasoline that were affected by Defendants' illegal conduct prior to that date, and thus had no duty to investigate the claims set forth in this Complaint until May 4, 2020. Defendants' secret joint venture agreements were inherently self-concealing.

69.     Defendants engaged in affirmative conduct that was designed to mislead and conceal their illegal conduct. For example, Vitol's Lucas affirmatively mislead the California Energy Commission ("CEC") about the true cause of high prices for gasoline that followed the Torrance Refinery explosion in February 2015.

70.     Defendants repeatedly misled OPIS about the true nature of their trading activities by reporting artificially high spot trades directly or indirectly between them but concealing the existence of offsetting wash trades that reduced or effectively limited any market risk in the primary trade.

---

[14] *See* CSB Releases Final Report into 2015 Explosion at ExxonMobil Refinery in Torrance, California, CSB (May 12, 2020 4:52 PM), https://www.csb.gov/csb-releases-final-report-into-2015-explosion-at-exxonmobil-refinery-in-torrance-california/.

71.     Additionally, the California Attorney General, as representative of the people of the State of California, obtained tolling agreements with Defendants that are applicable to the claims of Plaintiff and the Class, in whole or in part. These tolling agreements have effective dates of August 3, 2018, and March 8, 2019, respectively. Defendants and the California Attorney General subsequently executed additional tolling agreements to extend the termination dates of the tolling periods specified in the original agreements. These termination dates have not passed as of the filing of this Complaint.

72.     Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiff and the Class, the four year statutes of limitations governing claims under the Sherman Act, the Cartwright Act, and the UCL were tolled at least until May 4, 2020 pursuant to the injury-discovery rule, the doctrine of fraudulent concealment, and by virtue of express tolling agreements between the California Attorney General and Defendants.

## CLAIMS FOR RELIEF

### COUNT ONE

### VIOLATION OF THE SHERMAN ANTITRUST ACT
### (15 U.S.C. § 1 – Injunctive Relief Only)
### (Against All Defendants)

73.     Plaintiff hereby repeats and incorporates by reference each preceding paragraphs as though fully set forth herein.

74.     Defendants entered into and engaged in a continuing combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially restraining competition with respect to the price of gasoline within the State of California.

75.     Defendants' activities constitute a per se violation of Section 1 of the Sherman Act.

76.     Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and members of the Class by restraining competition and thereby raising, maintaining and/or stabilizing the price of gasoline at levels above what would have occurred if competition had prevailed. For this conduct, Plaintiff and members of the Class are entitled to entitled to injunctive relief pursuant to 15 U.S.C. § 26.

## COUNT TWO

### VIOLATION OF THE CARTWRIGHT ACT
**(California Business and Professions Code § 16720, *et seq.*)**
**(Against All Defendants)**

77.     Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

78.     Defendants entered into and engaged in a continuing combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of California Business and Professions Code § 16720 *et seq*. by artificially restraining competition with respect to the price of gasoline within the State of California.

79.     Defendants' activities constitute a per se violation of the Cartwright Act.

80.     Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and members of the Class by restraining competition and thereby raising, maintaining and/or stabilizing the price of gasoline at levels above what would have occurred if competition had prevailed. For this conduct, Plaintiff and members of the Class are entitled to entitled to treble damages and injunctive relief pursuant to California Business and Professions Code §16750(a).

## COUNT THREE

### VIOLATION OF THE UNFAIR COMPETITION LAW
**(California Business and Professions Code § 17200, *et seq.*)**
**(Against All Defendants)**

81.    Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

82.    Defendants committed acts of unfair competition, as described above, in violation of the UCL.

83.    Defendants' conduct constitutes an "unlawful" business practice within the meaning of the UCL, and includes, without limitation, the following:

- Violating the Sherman and Cartwright Acts, as set forth above; and
- Engaging in wash sales and otherwise manipulating the benchmark prices reported on the California gasoline spot market in violation of California Corporations Code §§ 29535, 29536, 29537, 29538 and the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*

84.    Defendants' conduct separately constitutes an "unfair" business practice within the meaning of the UCL because Defendants' practices have caused and are "likely to cause substantial injury" to the Plaintiff and the members of the Class that is not "reasonably avoidable" by them.

85.    Defendants' conduct, as alleged herein, was and is contrary to public policy, immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers.  Any purported benefits arising out of Defendants' conduct do not outweigh the harms caused to the victims of Defendants' conduct.

86.    Defendants' conduct is also "unfair" because it is contrary to numerous legislatively-declared policies, as set forth in the Sherman Act, the Cartwright Act, the California Corporations Code and in the Commodities Exchange Act.  Here,

Defendants' conduct not only violates the letter of the law, but it also contravenes the spirit and purpose of each of those statutes. The conduct threatens an incipient violation of each of those laws and has both an actual and a threatened impact on competition.

87. Defendants' conduct, as described above, also constitutes an "fraudulent" business practice within the meaning of the UCL. Defendants' trading activity on the California gasoline spot market fraudulently raised the price of gasoline above the competitive level through fictitious "wash" trades and other manipulative conduct that did not shift economic risk for the transaction to an arm's length counterparty. This conduct was designed to deceive — and did deceive — other market participants about the true supply and demand situation for gasoline in order to artificially increase the price of gasoline in California.

88. Plaintiff and members of the Class have suffered injury in fact and have lost money as a result of Defendants' violations of the UCL in that they paid more for gasoline than they would have paid in a competitive market. They are therefore entitled to restitution and injunctive relief pursuant to California Business and Professions Code §17203.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment on its behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

A. This action may proceed as a class action, with Plaintiff serving as the Class Representative, and with Plaintiff's counsel as Class Counsel;

B. Defendants have contracted, combined and conspired in violation of the Sherman Act and Cartwright Act;

C. Defendants have violated the UCL by engaging in conduct that constitutes unlawful, unfair and fraudulent business practices;

D.      Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

E.      Plaintiff and the Class are entitled to recover treble damages and/or restitution, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount subject to proof at trial;

F.      Plaintiff and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate;

G.      Plaintiff and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

        i.      A judicial determination declaring the rights of Plaintiff and the Class, and the corresponding responsibilities of Defendants; and

        ii.     Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from violations of the law as alleged herein.

H.      Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class;

I.      Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

J.      Plaintiff and the Class receive such other or further relief as may be just and proper.

**<u>JURY TRIAL DEMANDED</u>**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint that are so triable.

DATED: May 12, 2020                    **MILBERG PHILLIPS GROSSMAN LLP**

*s/ David Azar*
_____
David Azar (State Bar No. 218319)
16755 Von Karman Avenue, Suite 200
Irvine, California 92606
Telephone:  212-594-5300
Email: dazar@milberg.com

**MILBERG PHILLIPS GROSSMAN LLP**
Peggy Wedgworth (*pro hac vice forthcoming*)
Andrei Rado (*pro hac vice forthcoming*)
Blake Yagman (*pro hac vice forthcoming*)
One Pennsylvania Plaza, Suite 1920
New York, New York 10119
Telephone:  212-594-5300
Email:      pwedgworth@milberg.com
            arado@milberg.com
            byagman@milberg.com